MICHIGAN MUT. L. INS. CO. v. ABNER L. WHITTAKER, ADMR.

CONCEALMENT OF CONDITION OF HEALTH BY APPLICANT FOR INSURANCE, AS DISCLOSED BY CONSULTATION WITH THREE PHYSICIANS, FRAUDULENT.

The concealment by an applicant for life insurance, of the condition of his health, it appearing from the testimony that three physicians had informed him of the serious nature of his malady, one refusing to pass him for insurance, another telling him that he had an organic lesion of the heart, and the third discovering and disclosing to him an enlargement of the spleen, will sustain the defense of fraud in an action on his policy, even though the physician examining him on behalf of the company failed to discover anything abnormal in the condition of his health.

Insurance Co. v. Whittaker.

ERROR to Hamilton common pleas court.

**Robert Ramsey,** for plaintiff in error.

**C. W. Baker,** for defendant in error.

SWING, J.

This was an action on two policies of insurance issued by the defendant on the life of John C. Dexter. One policy was for the sum of $5,000 issued July 1, 1901, on an application signed June 20, 1901, and was for a five year term with privilege of renewal without medical examination for another five year term.

The other policy was a ten year policy with certain optional benefits as to change of time, and was for $2,000, issued September 10, 1901, on an application signed the same day.

The answer of the defendant admitted the issuing of the policies, and for a defense alleged that the policies were procured by the fraud of Dexter in misrepresenting to the defendant the state of his health and that he had given untrue answers as to his having made application for insurance and been refused.

The case was tried before a jury and a verdict rendered for the full amount claimed in both policies. Error is prosecuted to this court and the main ground urged is, that the verdict and judgment is not sustained by sufficient evidence.

At the time the policies were issued, Dexter was living in Columbia, Tennessee. He was a lawyer by profession; unmarried, and living with his mother. He left Columbia the latter part of October, 1901, and came to Cincinnati, and got employment with the Cincinnati Cordage & Paper Company. He died at Cincinnati, April 10, 1902. Dexter died very suddenly, and a post-mortem examination by Dr. Haerr disclosed that Dexter's spleen was of abnormal size. It was about thirteen inches long, and weighed about thirteen pounds; normally it should weigh about seven ounces, and be from six to six and one-half inches long. It was therefore about twenty-six times as large as it should have been. Upon observing the spleen, no further examination of the body was made and death was ascribed to this cause.

Some time prior to December 27, 1901, Dexter, who was a member of the fraternal order of B. P. O. E., made application to be admitted to the chapter at Cincinnati. Before admission, he was compelled to submit to an examination by the physician of the order. This physician happened to be the same Dr. Haerr who made the post-mortem examination. Dr. Haerr testified that he found in this ex-

amination a dullness on one side of his chest; he thought first it was his lung. It seemed to be solid, and was somewhat distended, but which he attributed to an enlargement of the spleen. Dr. Haerr then said to Dexter that he could not pass him as a well man. Dexter said he would not become a charge upon the lodge. The doctor reported to the lodge the result of his examination and statement, of Dexter as to not becoming a charge upon the lodge, and under these circumstances he was admitted to the Cincinnati chapter or lodge on December 27, 1901, which he regularly visited up to the time of his death.

Some seven members of this lodge who became acquainted with Dexter after he came to Cincinnati, and who met him mostly at the meetings of the lodge, gave evidence as to his appearance. Michael Meehan, tyler of the Elks' lodge, said he saw him at lodge meetings; was a small man in stature; seemed to be a delicate looking man; never noticed anything wrong with him, never heard him cough or spit.

William Bodemer testified; was presiding officer of Elks; did not notice anything out of the way with him; never heard him cough.

Burton H. Foster testified that he worked in the cordage company with Dexter, and knew him; said he heard of no illness of Dexter, and never heard him cough.

Several other persons who met him for the first time after he came to Cincinnati, testified in a similar manner. All of this evidence was clearly of no value; if it proved anything, it was, that there was nothing the matter with Dexter during the time that they knew him, whereas the truth of the matter is, without the slightest question, that Dexter died from the effects of diseased condition of his spleen and that his spleen was badly diseased at the time that Dr. Haerr examined him in December, 1901, and evidently had been for a long time prior to that date, as Dr. Haerr found it pressing hard against his lungs, and yet during this time these witnesses testified that they did not see anything out of the way with him. That there was something the matter with him, and of such a serious nature as to cause his death in a short time, is shown. The only effect of this evidence is to show at the most, that while Dexter was hastening to his death with this deadly disease, his condition was not suggested to his friends in his personal appearance. This evidence could have no value to the plaintiff, but might be against her in this, that it showed that only those who made careful examination of Dexter were able to discover that he was suffering with a deadly disease.

There was a large amount of evidence introduced on the trial of the

case in the form of depositions taken in Tennessee, where Dexter had resided for a number of years previous to his coming to Cincinnati, and which included some four physicians, besides quite a number of persons who had known Dexter intimately while he lived in Columbia, Tennessee. The testimony of three physicians, Doctors Briggs, Porter and Pillow, was taken by the defense, and the testimony of Dr. Williamson, the examining physician who made the examination upon which the policies of insurance were issued, was taken by the plaintiff.

The testimony of Dr. Briggs, of Nashville, Tennessee, was to the effect that he made a physical examination of Dexter in the spring or early summer of 1901, and found organic disease of the heart; thought him in a very bad condition, and liable to die in a short time; did not tell Dexter the result of his examination, but he did tell his mother. "I told him he had heart disease, and he seemed to be pretty well aware of it. Said he was going to Cincinnati; said he had been examined by Dr. Pillow, and came to me for confirmation. He said that Pillow had told him the same thing."

Dr. Porter, age 35, lived at Columbia, Tennessee; had known Dexter for fifteen years; belonged to the same lodge of Knights of Pythias; was examining physician for that order in 1901 and up to the present time; testified that Dexter made application to him as examining physician of that order; examined him, in a measure; saw him three times; the first time found his pulse over ninety; his heart with what is called a "stormy" heart, beating unduly, laboring under difficulties; heart beats rapid between ninety and one hundred; temperature one hundred and one-half, the first time, about the first of May. Told him to come back again. He came back in three or four days. Had the same examination, found an unduly enlarged abdomen. Did not investigate it further, but that was sufficient to stop the investigation.

He had fever on both occasions. About a week afterward, made another examination, but only to take his pulse and temperature. Found two and a half degrees of fever; and pulse accelerated and irritable. I made no further examination, as I knew he would not be accepted. I told him his temperature was elevated, and his heat unduly rapid. I told him it was not worth while for him to come back again. His shoulders were somewhat bent forward; flat chest; and general appearance was that of a man failing in health. A part of the examination was reduced to writing, and I told him it was hardly worth while to return, that I could not pass him. I never sent his application in.

There is absolutely no evidence in this case that tends to throw

### Hamilton County.

any discredit upon the truthfulness of these witnesses' testimony, unless it be found in the evidence of the plaintiff, or in the fact that Dr. Williamson, who made an examination some months afterwards, found none of these conditions to exist, but when taken in connection with the subsequent death of Dexter in less than a year from the time that Dr. Porter made the examination, and the further fact that within less than six months after that time Dr. Haerr, of Cincinnati, found the enlarged abdomen, which was caused by the enlarged spleen from which cause Dexter died, we are forced to the conclusion that this evidence of Dr. Porter was true, and that there is no evidence to be found in the record that has any weight which tends to disprove that the result of that examination was that Dexter was not in good health; on the contrary was suffering from an incurable disease, and that Dexter was so informed by Dr. Porter. Therefore, Dexter knew, or at least had evidence that would lead him to believe that he was not in good health. The fact is clearly shown that the result of this examination by Dr. Porter, and the facts communicated to him by Dr. Porter and Dr. Briggs, and the examination of Dr. Pillow, were not communicated to the insurance company at the time he was called upon to make disclosures to it.

Dr. Pillow, age forty-nine, practicing physician twenty-seven years, lived at Columbia all his life; graduated from the University of Pennsylvania; examining physician for the New York Life; Mutual Life; Mutual Benefit of New Jersey; Northwestern, Equitable, and others; was the family physician of Dexter and his mother; testified that he knew Dexter for many years; saw him frequently in 1901, during which time he made an examination of John before he went to the springs. He testified that Dexter had a harrassing cough; that he made a thorough examination of him, and detected an organic lesion of the heart. Dexter told me he wanted my honest opinion. I told him beyond question he had organic heart lesion, and said it was sometimes caused by a crowded stomach. That he had been looking bad, and that there was anxiety about his health for some time before I examined him. His mother requested me to examine him. His general appearance was of one in bad health; not as vigorous as he usually had been.

We see nothing in this evidence to indicate that what Dr. Pillow testified to was not the truth.

There is a great mass of evidence in this case, by friends and associates of Dexter who lived in Columbia, among them being Mr. Hatcher, a lawyer, in whose office Dexter worked for several years. It

is not necessary to go over in detail and point out the exact testimony of Mr. Hatcher. Everything indicated that it bears upon its face the marks of honesty and truthfulness, and we fail to discern from the record any reason why Mr. Hatcher should have testified to anything other than the truth. He had been a friend of Dexter, and evidently Dexter had been a friend of his. He regarded him very highly; aided him in his life; gave him employment and had advanced his interest, and we see no reason why he should give evidence in this case for any purpose other than to tell the truth.

The sum and substance of the fact of the evidence is, that Dexter, in the spring of 1901, was failing; that he looked bad and had all the appearance of one in bad health; that his appearance, to Mr. Hatcher, was just what one would expect it to be from the examination made by Drs. Briggs, Porter and Pillow.

It probably is unnecessary to take up the evidence of other residents and friends of Dexter who lived in Columbia, Tennessee, and review them carefully. It is sufficient to say that they all correspond, and all were of the same effect as that of Mr. Hatcher. From this evidence we take it that these witnesses are among the leading citizens of Columbia, Tennessee, and there is nothing in the record to show that they were not of men of the highest standing and integrity and truthfulness. Furthermore, there is nothing in the evidence to show that they had any interest in the litigation or that there was any reason why they should not tell the truth. It is true that these witnesses were not before this court, and we had no opportunity of forming any judgment of them from personal observation. But neither were they before the jury, and we have the same right to draw the conclusion from their evidence that the jury had. From a careful reading of the evidence, we come unhesitatingly to the conclusion that at the time these policies were written, and before, John Dexter was not in good health and that he was well aware of it. As against this evidence, we have the testimony of his mother, who was the real party in interest in this case. We do not desire to cast any reflections upon her evidence other than say that we think from her own evidence it is shown that at this period she was very much concerned about John's health. As against this evidence there stands out prominently the testimony of Dr. Williamson, the examining physician who made the examination upon which the policies were issued. His testimony is to the effect that he found nothing wrong with Dexter; that he found his pulse, temperature, heart,

### Hamilton County.

and stomach in a normal condition, or nearly so, at least his condition was such that he passed him as a fit subject for insurance.

In considering Dr. Williamson's testimony, it is proper to consider that he hardly stands in the light of a disinterested witness, as the correctness of his examination is certainly brought in question by the undisputed fact that Dr. Haerr, within less than three months after that examination, discovered enlarged abdomen and a pressure against the lungs which was caused by the disease that Dexter, within a week, died of.

Dr. Porter testified that he had found that condition to exist before Dr. Williamson made his examination. We are therefore compelled, from the evidence, to find that Dexter was not a sound man at the time these policies were written, that he had every reason to know it, and that he did know it, and that the jury, when they found differently, rendered a verdict which is not sustained by the evidence. The judgment therefore must be reversed, and remanded for further proceedings.

**Jelke** and **Giffen, JJ.,** concur.